## B. MIFFLIN HOOD CO. v. LICHTER et al.
### Civ. No. 550.

United States District Court
E. D. Tennessee, N. D.
Nov. 22, 1950.

Sam J. McAllester, Chattanooga, Tenn., for plaintiff.

Kramer, Dye, McNabb & Greenwood, Erma C. Greenwood, H. T. Poore, John V. Overton, Jr., and R. R. Kramer, all of Knoxville, Tenn., for defendants.

DARR, Chief Judge.

The plaintiff sues the defendant for a balance of $15,954.62 alleged to be due for concrete masonry blocks furnished by the plaintiff to the defendant as materials to be used in the construction of dwelling units at the townsite of the Clinton Engineering Works at Elza, Anderson County, Tennessee, being a part of the Oak Ridge Project. The defendant was subcontractor for the erection of the said dwelling units under the prime contractor, O'Driscoll & Groves, Inc., who was operating under a negotiated contract with the United States.

The complaint is based on orders entered by the defendant with the plaintiff on April 3, 1943 and April 14, 1943 for the manufacture, purchase and delivery of concrete building blocks, and the failure of the defendant to pay therefor in full as required.

The defendant denies that there was any order for the blocks except an order bearing date April 3, 1943 and denies that it is indebted to plaintiff in any sum. It claims credit for certain additional labor costs of $9,835.56 which it says was caused by plaintiff's delay in furnishing materials as required and by plaintiff's providing blocks which were condemned and which defendant was required to remove after having been put in place in the buildings. Defendant also claims a deduction of $2,156.50 for broken blocks caused in delivery by plaintiff's agents.

The defendant, in addition, pleads accord and satisfaction by reason of the fact that on two checks issued to plaintiff there was an endorsement which amounted to an acceptance of defendant's claims as credits, as will more fully appear hereinafter.

The defendant also filed a counterclaim for $17,092.56 for certain items of expense which it had incurred on account of the plaintiff's delay and for breach of original contract in making timely delivery of the 8 x 8 x 16 blocks.

On July 16, 1945, the parties entered into a stipulation to the effect that the amount sued for by the plaintiff and claimed to be due it as unpaid is the sum of $12,175.20; that the defendant claims and the plaintiff disputes the allowance of

(1) $8,917.04 for additional labor charges due to plaintiff's failure to deliver 4 x 8 x 16 and 12 x 8 x 12 and special sizes of blocks as required by the contract, said sum consists of three claims, viz.:

(a) $6,223.29 for additional labor costs account installing the blocks as a separate operation.

(b) $1,883.11 additional costs for using two blocks 8 x 8 x 16 instead of one 12 x 8 x 12.

(c) $810.64 ten percent overhead.

(2) $918.52 for labor and material charges for removal, tearing down and rebuilding walls, account rejection of Grey Products 2-cell blocks.

(3) $524 for breakage from August 1, 1943 to end of work.

(4) $1,632.50 breakage from beginning through July 31, 1943.

(5) $17,092.56 counterclaim of defendant for damage for delay in delivery of 8 x 8 x 16 blocks.

Item 2 is apparently reduced to $912.32 in the present claim; so that the total deductions which the defendant claims amount to $11,985.86. The balance in plaintiff's favor would thus only be $189.34 after allowing these credits. Separate and apart from this is defendant's counterclaim for $17,092.56.

The issues are thus limited (1) to the validity of defendant's claims for $8,917.04 for additional labor charges, $912.32 for labor charges in connection with Grey Products 2-cell blocks, and the two claims aggregating $2,156.50 for breakage, (2) to the validity of defendant's claim of accord and satisfaction growing out of the endorsement of the checks, and (3) the validity of defendant's counterclaim.

The defendant's claims of set-off under (1) above will be first discussed without

regard to the efficacy of the plea of accord and satisfaction.

The following facts are established by the weight of the evidence.

The defendant having a subcontract for the construction of eight hundred fifty houses at the Clinton Engineering Works at Elza, Tennessee, gave the following offer to plaintiff, bearing date of April 3, 1943, for the furnishing of concrete blocks for said buildings, which offer was accepted by plaintiff.

"The Southern Fireproofing Company

Fireproofing Contractors

Cincinnati, Ohio

April 3, 1943 Date

Order No. 4604

This order number must appear on all invoices

B. Mifflin Hood Company Job Housing Project, Elza, Tenn.

To

Daisy, Tenn. Location

This is your order to furnish the following described materials and/or services:—

| Quantity | Description | Price |
|---|---|---|
| All necessary | Concrete masonry units to conform to specifications, as follows:— | |
| | 8x8x16 Hollow | 135.00 per M |
| | 8x8x12 " | 112.50 " " |
| | 4x8x16 solid | 105.00 Hollow 75.00 |
| | 12x8x16 Hollow | 180.00 " " |
| | 12x8x12 " | 135.00 " " |
| | 12x8x12 Solid | 200.00 " " |

Corner block to be at same prices as corresponding standard unit.

Half block to be at half price of corresponding unit 4x8x16 solid block with holes per detail to be at same price as standard solid block.

You are to be in position to begin deliveries within five days from date hereof, and to be in position to deliver 8000 to 10,000 units per day thereafter. Deliveries to be made to the nearest accessible point to the site of buildings, as designated by us.

Accepted April 3, 1943

B. Mifflin Hood Co.

by (s) Hayden P. Grant

2% after freight, 15th proximo

| Terms | Freight to be remitted every 5 days upon statement from you. | |
|---|---|---|
| F.O.B. | Delivered job by truck. | |
| Routing | | Instructions |
| Required by | Beginning 5 days from date | All Deliveries to Job Must Be Accompanied by Sales Slips. Invoices to be Mailed Daily to Cincinnati Office. This Order is Acceptable Only at Prices and Terms Stated, and |

224

Right is Reserved to Cancel Same if Delivery is not Made Within Time Specified.

The Southern Fireproofing Company

Per (s) Jacob Lichter

The Conditions on the Reverse Side Are Part of This Order"

(Reverse Side of Order)

"It is hereby agreed that, in accepting this order, you assume full liability for all contributions, excise taxes, or other taxes, applicable on account of any unemployment insurance or old age pension laws, either State or Federal, which may now exist or which may later be assessed or imposed. The prices stated above include all Sales Taxes.

"All shipments must be made within two days after receipt of notice by you. Time is the essence of this order. The vendor acknowledges that he is aware that material or services covered by this order must be incorporated in a building which is under contract to be completed by a day certain, and that damages will accrue in case of failure to ship promptly.

"The vendor expressly warrants and guarantees that all materials covered by this order will be equal in every respect to samples submitted and approved."

(Defendant's Exhibit No. 1)

The plaintiff was engaged in manufacturing a concrete block under the trade-name of "Hoodlite", which was to be used in filling the order. As shown on the face of the order, no quantity was specified either in the aggregate or for individual items. No date for or schedule of deliveries was set out.

The plaintiff had in stock 50,000 to 75,000 of Hoodlite blocks and had an unlimited supply of raw materials for manufacturing them, and a daily capacity of 8,000 to 10,000 units. The plaintiff was in position to commence shipments within five days and to ship from 8,000 to 10,000 per day as called for in the order. The Hoodlite was a pink block.

Prior to the date when shipments were to begin the defendant notified the plaintiff not to ship the Hoodlite block; that the area engineer had rejected it on account of color. While no color was specified in the specifications, the area engineer required a white or grey block.

Hoodlite block complied in full with the specifications, in fact they exceeded the requirements by forty per cent.

When the Hoodlite blocks were declined, plaintiff apparently could have enforced the order, as the blocks fully met requirements.

But negotiations were resumed at defendant's instance between Pullen for defendant, and Grant and Pickett for plaintiff, to discuss the possibility of obtaining grey blocks. After a discussion Pickett and Grant declined to undertake it. The reasons as explained to Mr. Pullen were that the plaintiff's plant was set up for manufacturing Hoodlite blocks and that they had no source of supply for an aggregate that would make a grey block. To manufacture a grey block would necessitate finding a source of supply that could be used, and facilities to get it into the plant. Several mechanical changes would have had to be made in the plant, including a railroad siding for delivery of the raw materials. Mr. Pullen urged Pickett and Grant to consider it further. And Pickett telephoned the Superock Company in Birmingham, Alabama, the only known producer of an aggregate from which a grey block could be made. The Superock Company replied that they were not in position to guarantee any definite amount of Superock, but would supply as much as possible. This information was communicated to Pullen. Pullen told Pickett the job would have a high priority and he thought he could obtain such priority. With the understanding with Pullen that the arrangement would be wholly de-

pendent on plaintiff's ability to get the raw material and make the several changes in plant that were necessary, the amended order of April 14th was prepared and signed by Pullen for defendant and by Grant for plaintiff. The order was as follows:

"April 14, 1943.

B. Mifflin Hood Company
Daisy, Tennessee

Re: Housing
Clinton Engineering Project
Elza, Tennessee

Gentlemen:

We hereby supplement our purchase order No. 4604 dated April 3, 1943.

You are to furnish all necessary slag aggregate concrete masonry units (Superock) of a standard grey color at the following prices:

| | | | | |
|---|---|---|---|---|
| 8x8x16 | Hollow | @ | $155.00 per M. | |
| 8x8x16 | Solid | @ | 230.00 per M. | |
| 8x8x12 | Hollow | @ | 129.00 per M. | |
| 4x8x16 | Solid | @ | 125.00 per M. | Hollow 95.00 |
| 4x8x12 | Solid | @ | 93.75 per M. | |
| 12x8x12 | Solid | @ | 230.00 per M. | |
| 12x8x12 | Hollow | @ | 155.00 per M. | |

All other terms and conditions of our order No. 4604 to apply except that prices are net 15th prox.

All block are to be in accordance with applicable federal specifications and subject to the approval of the architects, engineers and ourselves.

Yours very truly,
Southern Fireproofing Company
By (s) H. L. Pullen

Accepted: 4–14–43
B. Mifflin Hood Company
By (s) Hayden P. Grant"
(Defendant's Exhibit No. 2)

Not until April 22nd did defendant obtain and give notice to plaintiff of approval of Superock for use in manufacturing the block, and about the same date defendant furnished a priority order to Superock Company in Birmingham. Mr. Pullen spent about a week at the plaintiff's plant, observing the experimental use of Superock in making the blocks, and assisting plaintiff in arranging with the railroad to put in a siding at the plant.

Shipments of the blocks began as soon as the formulas for content and dies could be worked out. It was April 27th before defendant furnished plaintiff any formal estimates of the total requirements; and supplemental work sheets were submitted from time to time, varying as to the total requirements and as to daily deliveries. The stock sheets called for a daily delivery ranging from 5,505 to 9,224, and called for numerous items or types of blocks not contained in the orders of April 3d or 14th.

Plaintiff endeavored to comply with defendant's requests but could not because the railroad siding was delayed and not completed until June 5th; and also because of insufficient quantities of the raw material, Superock. In June a nationwide coal strike occurred as a result of which the supply of Superock was wholly suspended.

In this situation defendant learned of a supply of Superock blocks which a company at Sheffield, Alabama, had in stock. On inquiry it was learned that these were two-cell blocks, while the blocks the defendant was using were three-cell. Defendant's agent, Mr. Pullen, requested plaintiff to ar-

range to furnish some of these blocks, agreeing to have them tested for use before installing them. Plaintiff agreed to do this, and when the first installment arrived, defendant proceeded to install them before any tests were made. These were later condemned and their removal from buildings required.

The defendant early began complaining to plaintiff of shortages in deliveries. On May 27th, he demanded three carloads daily (over 12,000). On June 2, 12,000 to 15,000 units per day. Constant complaints followed every few days. The plaintiff was called upon repeatedly to make deliveries of 12,000 to 14,000 per day, which were largely in excess of the daily deliveries called for in the stock sheets furnished. Defendant claims that the increased deliveries were demanded to make good earlier deficiencies; and plaintiff was notified that defendant would expect plaintiff to reimburse it for its extra cost on account of the delays.

On or about August 6, 1943, the defendant notified plaintiff that it desired to obtain blocks for the construction of fifty additional houses; and these were processed under the original orders for the eight hundred fifty houses. The defendant completed its work on the total projects about September 13th, at which time the plaintiff had supplied defendant with his total requirements amounting to 800,923 units.

The amount due the plaintiff for balance on the blocks sold is agreed to by stipulation; therefore the questions arise only on the claims for credit and set-off by defendant as outlined above.

(1) The defendant is not entitled to recover, nor is he entitled to a deduction for, the item of $8,917.04 which is for plaintiff's alleged delay in making timely delivery of certain of the blocks. This conclusion is based on the absence of any legal obligation on the plaintiff to furnish blocks at any particular time.

The failure of plaintiff to manufacture and deliver blocks as fast as defendant desired was due to the delay in getting the railroad siding installed, and to the failure to obtain Superock in the necessary quantities. The order of April 14th was accepted subject to such contingencies.

Defendant insists that proof of these conditions was entirely oral and was incompetent, on the principal that prior oral negotiations are merged in the contract (of April 14th) when it was reduced to writing.

The testimony however was competent as it does not contradict or vary the terms of the written instrument; and was evidence of the intention of the parties and the conditions and inducements which led to its execution. Travelers Ins. Co. v. Sides, 184 Tenn. 663, 202 S.W.2d 815; Hibernia Bank & Trust Co. v. Boyd, 164 Tenn. 376, 48 S.W.2d 1084; Hughes v. Herbert, 159 Tenn. 187, 17 S.W.2d 16; McGannon v. Farrell, 141 Tenn. 631, 214 S.W. 432; Hines v. Willcox, 96 Tenn. 148, 33 S.W. 914, 34 L.R.A. 824, 832; Breeden v. Grigg, 67 Tenn. 163, 32 C.J.S., Evidence, § 970, p. 933, § 1000, p. 979, § 1003(1), p. 998.

Furthermore, the amendatory contract of April 14th and the contract of April 3d to which it was supplementary, do not obligate the plaintiff to deliver any quantity of blocks daily. The defendant says that the April 14th contract by reference imposed on defendant the obligations of the April 3d contract (order No. 4604) which provided: "You are to be in position to begin deliveries within 5 days from date hereof and to be in position to deliver 8000 to 10,000 units per day thereafter."

Defendant insists that the latter quotation should be interpreted as requiring the plaintiff to deliver from 8,000 to 10,000 units of the Superock blocks per day.

These contracts cannot be so interpreted. The intention of the parties must be considered; and it is clear that the parties did not intend that all the provisions of the April 3d contract (order No. 4604) should continue in force except the change in the content and prices of Superock blocks.

If the defendant's position were correct, then defendant remained obligated to buy the Hoodlite blocks covered by the contract of April 3d. Those blocks completely complied with specifications and the amend-

atory contract did not in any way substitute the Superock for the Hoodlite.

Then too if defendant's position were correct, the plaintiff would have been required by the amendatory order to commence deliveries of Superock blocks within five days from April 3d, or on April 8th, which of course was impossible, the amendatory order not having been executed until April 14th.

Or to illustrate further, the contract of April 3d contains a provision printed on the back on which defendant relies, reading as follows: "All shipments must be made within two days after receipt of notice by you."

On April 24th, defendant delivered to plaintiff a stock sheet itemizing his requirements for each type of block, and giving the total requirements as 357,600 units. No daily requirements were specified. If the above provision was to be given effect, then plaintiff would have been required to deliver 357,600 units of the various types within two days. This clearly was not the intention of the parties, and further illustrates the entire absence of any contractual requirements as to delivery dates.

That other extraneous matters were involved in the amendatory order of April 14th is evidenced by the fact that it was not to be effective on its date, April 14th, and not until defendant had obtained approval of the project engineers for the use of Superock, which approval was on April 22d and reached plaintiff on April 23d.

It could, therefore, not have been the intention of the parties that the plaintiff, by the amendatory contract, was obligated for the daily delivery of from 8,000 to 10,000 units.

It should be observed that the contract of April 3d does not contain an *obligation* for daily deliveries, of specific quantities. That contract says only that, "you are *to be in position* to deliver 8000 to 10,000 units per day." This contract written by defendant cannot be said to create an obligation for such deliveries. But it is admitted that the language definitely referred to Hoodlite blocks of which plaintiff had a large

stock on hand and was in position to deliver the daily quantities as stated. As hereinabove shown, it was not the intention of the parties that this requirement (if it should be so construed) had any relation or application to the Superock.

Defendant's agent, Pullen, spent a week or more at the plaintiff's plant following the April 14th contract, assisting in the effort to get the railroad company to install the siding, and on May 7th defendant wrote plaintiff as follows: "It is our understanding that Washington has advised you that no authority or approval is necessary to permit the use of materials you now have for the construction of the siding you *require*. We understand that you are following this with the Southern Railroad today to the end that they may have confirmation on this routing so that they can proceed at once with the construction of the track."

The siding was completed June 5, 1943.

Defendant obtained or furnished the priority that enabled plaintiff to obtain the Superock, and after the suspension occurred or was threatened by the coal strike on June 29th the prime contractor, O'Driscoll & Groves, Inc., after a conference with defendant, wrote the following letter to Stone & Webster, the project engineers, as follows:

"June 29, 1943

P. O. Box 418
Knoxville, Tennessee

Re: Cont. W–7415–eng–1
Clinton Engineer Works
Stone & Webster Engineering Corporation
P. O. Box 1751
Knoxville, Tennessee

Gentlemen:

Confirming our conversation today between your Mr. Hall, our Mr. Thompkins, and Mr. Lichter of the Southern Fireproofing Company, we have been informed by Mr. Pickett, General Supervisor for the B. Mifflin Hood Company, manufacturers of the concrete block which we are using in the foundations of this project, that by reason of the recent strike in the coal industry and the current underproduction of coal, a large decrease is expected in the production of slag in the Birmingham

district. The Superock Corporation, of Birmingham, Alabama, which controls the market of slag for use as an aggregate in concrete blocks, has advised the B. Mifflin Hood Company that the effect of this condition in the coal industry will be reflected in their out-put of slag aggregate some time during the current week. As you know, the B. Mifflin Hood Company only recently began producing block of the aggregate and as a result has not had an opportunity to build up a reserve supply. Hence, any decrease in their current shipments of this aggregate will result in a decrease or total cessation of their out-put.

As you are aware, the Priority Rating for this project is AA–2X. It is our understanding that the Priority Rating for practically all of the projects for which the Superock Corporation is presently furnishing aggregate is AA–3. Nevertheless, we understand that the Superock Corporation has been proportioning its out-put among its various customers.

The B. Mifflin Hood Company advised us that they have ordered 15 cars to be delivered to them during the current week; that they desire to increase this order to nineteen for the current week; that they desire 24 cars shipped during the week beginning July 5th; and 24 cars per week thereafter until further notice.

*The purpose of this letter is to anticipate the expected decrease in the supply of slag aggregate and avoid, if possible, slowing up or stoppage of the work on this project by having someone of authority, either of your company or the Corps of Engineers, contact the Superock Corporation, pointing out the Priority Rating for this project, and obtaining the assurance that they will meet the above schedule set by the B. Mifflin Hood Company without fail.*

We will appreciate any co-operation you can give us in this connection.

> Very truly yours,
> O'Driscoll & Grove, Inc.
> (s) A. V. Hanson"

(Italics supplied.)
(Exhibit "J")

Nothing could be plainer than that the defendant, the Prime Contractor, and the project engineers, all knew that plaintiff's obligation and ability to deliver Superock blocks was dependent on the installation of the railroad siding, and on obtaining the Superock aggregate in sufficient quantities from Superock Company in Birmingham, that organization being the only producer of this commodity; and it also is clearly indicated by this letter that plaintiff was doing everything possible to obtain Superock.

It is worthy of notice that the defendant in submitting its first stock sheet on April 27, 1943, to advise the plaintiff of the estimated total quantity and the requested daily delivery of blocks, without attempting to comply with or follow the contracts, included several types of blocks not included in the contracts. The estimated total quantity at that time was 361,000 with daily requirements of 5,505. The first time the defendant appears to have submitted its detailed daily requirements was on or about May 9th or 10th (the paper being undated). The daily requirements (including the several types of blocks not found in the contracts) shown in this stock sheet is 5,505, with additional 3,719 extra blocks required on account of increase in depth of foundation. Additional stock sheets were filed from time to time with varying estimates of both total and daily requirements; and the last was filed on June 2, 1943, showing total requirements of 592,400 with daily requirements of 9,085 units.

It results that while defendant repeatedly protested about the delays, and advised plaintiff that plaintiff would be held accountable for defendant's additional costs and expenses, the Court is of the opinion that plaintiff has reasonably complied with all legal obligations as to deliveries, and that deliveries were within a reasonable time under the circumstances.

The stock sheets setting out daily requirements for delivery could not in themselves create any legal obligation. The fact that plaintiff sought to co-operate and meet defendant's demands, does not mean that he must do so at his peril. If daily requirements were to be enforced against plaintiff the contracts would have so provided. But they did not. And defendant's demands

were wholly unjustified and without color of right.

■ Where no time is specified for delivery, the general rule is that delivery will be made within a reasonable time. 17 C.J.S., Contracts, § 503, pp. 1065, 1068.

■ (2) The defendant claims a further credit of $912.32 for the additional expense for removal and tearing down walls necessitated by the rejection of the Grey Products two-cell blocks. As hereinabove shown, these blocks were obtained at defendant's request, upon a representation that they would be tested by defendant before being used.

Defendant installed about one carload of these blocks without having a test made, and the inspectors later condemned them and required that they be removed. It is for this cost of removal that claim is made.

While Mr. Lichter denies this transaction as outlined above, he was not present and could not know what occurred. All of the pertinent evidence tends to show that the facts were as stated above. The letter quoted above written on June 29th by O'Driscoll & Groves, Inc., the prime contractors, recites that a conference had been held with Mr. Lichter; that due to the coal strike the supply of Superock was short; and requested the project engineers to assist in rushing and increasing deliveries of Superock from Birmingham.

This extra expense was not occasioned by any act or default of plaintiff, and the defendant is not entitled to the amount of the expense as a credit.

(3) The claims of $524 and $1,632.50 for breakage in delivery will be allowed. The evidence in support of the amounts is uncertain and indefinite and not wholly satisfactory, but the defendant says the plaintiff's manager, Mr. Grant, agreed that two percent would be a fair estimate, and so far as the Court can discover, this was not denied. The accounts claimed represent the breakage on the basis agreed to by Mr. Grant. The propriety of allowing these two items is conceded in plaintiff's brief.

(4) The defendant also pleads accord and satisfaction based on the following situation:

On August 16, 1943, defendant delivered to plaintiff a check accompanied by a voucher. On the voucher were listed the several invoices previously submitted by plaintiff for blocks shipped, from which was deducted an item of $1,632.50 representing a claim against plaintiff for blocks broken in shipment.

Similarly on September 15, 1943, defendant delivered to plaintiff another check, accompanied by a voucher; and on this voucher there were listed the several invoices submitted by plaintiff for blocks shipped since the former settlement. The plaintiff's invoices were listed on the voucher at their face amount, and a total of such invoices $25,733.13 was then shown. Following this list of invoices, the defendant attached three claims against the plaintiff, one for $8,917.04 (the same claim referred to above) for additional costs, expenses and losses which the defendant claimed it had sustained on account of plaintiff's failure to deliver to it material in accordance with the contract and at proper times thereunder; another for additional costs and expenses in the sum of $918.52 incurred by defendant by reason of certain blocks failing to meet the tests and requirements, so that they had to be removed from the walls (the so-called grey two-cell blocks referred to above); and the third for $524 for breakage of blocks subsequent to July 31, 1943.

On each of said checks there was printed on the back, above the customary place for endorsement, the following legend: "Acceptance and endorsement of this check is acknowledgment of settlement in full of items listed on voucher attached bearing same date."

The checks were drawn payable to Hamilton National Bank and B. Mifflin Hood Company and by them endorsed. The bank was assignee of the account of which the defendant had notice; and the bank's endorsement was "without recourse".

Under the foregoing facts, defendant pleads accord and satisfaction, and says that plaintiff accepted said checks in satisfaction of its invoices included in the vouchers "to the extent of the face amount of said respective checks, and also to the extent of the items of $1632.50, $8917.04, $918.52 and $524.00 as shown on said vouchers".[1]

The defense of accord and satisfaction cannot be sustained.

A statute of Tennessee provides: "All receipts, releases, and discharges in writing, whether of a debt of record or a contract under seal, or otherwise, shall have effect according to the intention of the parties thereto." Williams Code of Tennessee, sec. 9741.

■ To constitute accord and satisfaction an offer with intent to satisfy the obligation and an acceptance with intent that it shall operate as satisfaction are essential. Lytle v. Clopton, 149 Tenn. 655, 261 S.W. 664.

Upon receipt of the check of September 16, 1943, plaintiff wrote defendant on September 21st that it did not consider the check as payment in full; and that the deductions made from the vouchers were considered arbitrary and unjustified under the facts and circumstances. Then, on September 22d, the defendant replied, in a letter to plaintiff's counsel: "If your client wishes to raise any question in regard to our invoices, or to discuss any phase whatsoever of their account, we shall be happy to arrange to meet, either with them alone or jointly with you."

■ Reply by the defendant clearly indicates an unclosed account after the checks were cashed. The statement in reply to the plaintiff's protest, taken in conjunction with the fact that the legend on the back of the check above the endorsement was printed and therefore intended as an endorsement for payees of all its checks and was not especially prepared and inserted for this particular payee, must be interpreted as indicating the intention of the parties that the checks were not given or accepted as an accord and satisfaction of the accounts.

In Helms & Willis v. Unicoi County, 166 Tenn. 639, 64 S.W.2d 200, 202, the Court said: " 'To constitute a valid accord and satisfaction it is also essential that what is given or agreed to be performed shall be offered as a satisfaction and extinction of the original demand; that the debtor shall intend it as a satisfaction of such obligation, and that such intention shall be made known to the creditor in some unmistakable manner. It is equally essential that the creditor shall have accepted it with the intention that it should operate as a satisfaction. Both the giving and the acceptance in satisfaction are essential elements, and if they be lacking there can be no accord and satisfaction. The intention of the parties, which is of course controlling, must be determined from all the circumstances attending the transaction."

Therefore under the statute and rulings of the courts of Tennessee, the tender and acceptance of the check must be given effect according to the intention of the parties, and it would not effect an accord and satisfaction.

■ Even where it was issued with the intention of effecting an accord, the condition may be waived by failing to insist on it. 1 C.J.S., Accord and Satisfaction, § 33(c), p. 527; Cf. Work v. Associated Almond Growers, 102 Cal.App. 232, 282 P. 965; J. P. Burton Coal Co. v. John P. Gorman Coal Co., 22 Ohio App. 383, 153 N.E. 863.

■ Furthermore it is to be noted that the amount of the plaintiff's indebtedness was not in dispute and is in excess of the payment made by the check. Where the indebtedness is liquidated, the check would not effect an accord and satisfaction. Fire Insurance Association v. Wickham, 141 U.S. 564, 12 S.Ct. 84, 35 L.Ed. 860; Keene v. Gauen, 5 Cir., 22 F.2d 723; Ferryboatmen's Union of Cal. v. North-

---

1. The items of $1,632.50 and $524, being claims for broken materials, have been allowed upon the merits and are not for consideration under the defense of accord and satisfaction.

western Pacific R. Co., 9 Cir., 84 F.2d 773; Wunderlich v. National Surety Corporation, D.C., 24 F.Supp. 640; Helms & Willis v. Unicoi County, supra.

The case is distinguishable from Schwartzenberg v. Mayerson, 6 Cir., 2 F.2d 327, and other cases relied on by defendant, wherein there was a controversy in the amount claimed by the plaintiff.

■ As the checks as issued were not in compromise of the amount of the plaintiff's claim, the correctness of the invoices being admitted, the checks were in compromise and adjustment of the unliquidated claims of the defendant for credit. These were the only matters that were in controversy.

"If there be a bona fide dispute as to the amount due, such dispute may be the subject of a compromise and payment of a certain sum as a satisfaction of the entire claim; but where the larger sum is admitted to be due, or the circumstances of the case show that there was no good reason to doubt that it was due, the release of the whole upon payment of part will not be considered as a compromise, but will be treated as without consideration and void." Fire Insurance Association v. Wickham, supra [141 U.S. 564, 12 S.Ct. 87].

The courts are not in accord on the question whether the debt sued on is liquidated or unliquidated where the debt or demand is itself certain and undisputed, but the debtor claims to be entitled to a set-off, counterclaim or reduction, and the creditor disputes or denies his right thereto or the amount thereof; and the apparent weight of authority seems to support the view where there are such disputed claims of set-off or credit, the entire transaction is unliquidated and may be the subject of accord and satisfaction by way of compromise. 1 C.J.S., Accord and Satisfaction, § 32(3), p. 520.

■ However, the Tennessee court has adopted the other view, viz., that a counter or additional claim in dispute does not render the principal obligation unliquidated where such principal obligation is itself not in dispute. An accord and satisfaction in such cases as here involved

would not be applicable. Helms & Willis v. Unicoi County, supra [166 Tenn. 639, 64 S.W.2d 202]. In that case the Court said: "There was no controversy between the parties as to this item, and the county admitted its liability for that sum; hence the plea of accord and satisfaction was ineffective as to the liability of the county for extra work due to the fire."

While the item in dispute in that case was an added item, the principle is the same whether the item in dispute be one that is added or one that is deducted.

(5) The defendant's counterclaim for $17,092.56, consisting chiefly of damages for plaintiff's alleged delay in making delivery of the 8 x 8 x 16 blocks, is disallowed for the reasons that: (1) the claim is wholly speculative and uncertain; and (2) the plaintiff did not breach the contract and is therefore not liable.

Mr. Lichter says he determined the amount of the damage "by determining the slow-downs at various times and then used my judgment to balance the effect against all of the 8 x 8 x 16".

At another place he says: "I calculated it by observing the work of the men. The increase in cost varied greatly from time to time depending on the various crews, depending on how soon they were going to run out of block and depending also on what moves we had to make. I had to use my judgment in balancing all of those from my own observation of the work, to arrive at a cost per block that was attributable to that cost". He further explained that what he meant by "observing the men" was that if he had no blocks for the men they had to be laid off. That when they saw they were going to be laid off they would take steps to prevent that by slowing up their work and prevent their material from disappearing. He said that when the men had sufficient material they would normally lay from 200 to 225 blocks per day. But in some of the crews the number would fall to 100 or less per man per day and the reason always was that they did not have the blocks and they merely had to slow down.

Mr. Lichter spent most of his time in the Cincinnati office and was at the project

only about once every ten days. His opportunities for "observing the men" were thus too limited to form a basis for the delays. No itemized account of the additional expense was kept, as testified by defendant, and no account was kept of the work that was affected by plaintiff's alleged delay,."because in order to determine what was chargeable to the Hood Company we would have to deduct what originally would have been the cost had the work been done at the proper time. In other words, you would have to keep a record of a difference in cost and there is no such record. *It is impossible to do it*". (Emphasis added.)

Despite Mr. Lichter's statement that it is impossible to make a record of the difference in cost, he attempts to do so by theoretically determining what was the cost per block of laying blocks "according to their experience", and what was the actual cost on this project. It is obvious that this is not a proper criterion, as the costs on other jobs where "their experience" was obtained might have been under wholly different conditions, and wholly different prices of labor. Mr. Love, the defendant's superintendent in charge, undertook to corroborate Mr. Lichter's figures of 2½¢ additional costs per block. He based his estimate on "my experience and my spot check". This is wholly speculative and uncertain. Furthermore the cost of laying *brick* varied from $36 per thousand on one day to $40 per thousand on another, according to Mr. Love's daily report of operations.

There was no delay whatever on deliveries of brick, and this variance in the cost of laying brick is not accounted for. The same conditions that caused a deferential in the cost of brick laying may well have been the cause of the additional costs of laying blocks.

Mr. Lichter, in explaining the method of establishing estimates of cost, stated with respect to this job: "What happened on this job, after we got the job, we found a condition existing that we had no knowledge of in the first place and then later we had to revise our ideas of the work to do on the job. Our original estimates for laying block on the job was 10¢ and I had Mr. Love shoot at 8¢. We found we had to work on a lump sum contract, that is where we only had a certain price we had to work within the price and at the same time there was a much larger project on a cost plus basis. When we got that I revised by basis of what I anticipated on the job at the end but I never revised my figures to Mr. Love".

That the job proved wholly different from what defendant had anticipated, is further shown by the stock sheet (undated) that was furnished the plaintiff about May 7th, wherein the extra blocks required daily on account of increase in depth of foundation was shown to be 3,719 additional above the figure of 5,505 for the work as originally anticipated. And again in defendant's letter of August 9, 1943, it was said: "Please understand that it is physically impossible to make an accurate estimate of the exact requirements to complete the job at this time because of the many indeterminate factors".

 It is, therefore, not at all clear that this additional cost was occasioned by any delay of plaintiff. In fact the contrary appears likely. In any event the claim is not supported by evidence that is sufficiently definite and clear to justify its legality.

Furthermore, the counterclaim cannot be allowed because, as set out above, the plaintiff was not legally obligated to deliver the blocks as defendant has assumed and herein claims; and not being in default any such additional costs cannot be charged to plaintiff.

The plaintiff is, therefore, entitled to recover the amount owing on account in the sum of $12,175.20 and the defendant is entitled to recover on the counterclaim for the amount of breakage in the sums of $1,632.50 and $524, leaving a total award given to the plaintiff to be $10,018.70 with interest at four percent from the filing of the complaint. The cost will be paid one-fifth by the plaintiff and four-fifths by the defendant.

This opinion will serve as the findings of fact and conclusions of law. A proposed judgment may be submitted.