ARCATA GRAPHICS COMPANY and Arcata Graphics/Hawkins, a division of Arcata Graphics Kingsport, Inc., Plaintiffs–Appellees,

v.

HEIDELBERG HARRIS, INC., Defendant–Appellant.

HEIDELBERG HARRIS, INC. and Heidelberg Harris, S.A., Counterplaintiffs-Appellees,

v.

ARCATA GRAPHICS COMPANY and Arcata Graphics Kingsport, Inc., Counter-defendants-Appellants.

Court of Appeals of Tennessee, Eastern Section, at Knoxville.

June 29, 1993.

Permission to Appeal Denied by Supreme Court March 7, 1994.

Stuart M. Brown, Lillick & Charles, San Francisco, CA and Michael A. Faulk, Church Hill, for plaintiffs/appellees and counter-defendants/appellants.

Charles H. Warfield, H. Naill Falls, Jr. and Garry K. Grooms, Farris, Warfield & Kanaday, Nashville, for defendant/appellant and counter-plaintiffs/appellees.

## OPINION

LEWIS, Judge.

The original defendant, Heidelberg Harris, Inc. (Harris), appeals from the judgment entered on the jury verdict which awarded plaintiff, Arcata Graphics/Hawkins (Hawkins) $1,000,000.00. In addition, the original plaintiffs, Arcata Graphics Company (AGC) and Arcata Graphics/Hawkins, a division of Arcata Graphics Kingsport, Inc. (Kingsport), in their capacity as counter-defendants, appeal from the judgment entered on the jury verdict which awarded counter-plaintiffs, Harris and Heidelbert Harris, S.A. (Harris S.A.)[1] $1,151,000.00.

The instant suit arose from Harris' sale of two large printing presses to Hawkins in early 1987. The presses, known as M-300Ms, were manufactured by Harris S.A. and were installed at Hawkins in the spring of 1988.

AGC filed the instant suit against the defendants in August 1990 and alleged that the presses never performed as represented or warranted. AGC also alleged breach of contract and/or warranty and tortious misrepresentation and demanded both compensatory and punitive damages.

Following entry of the judgment on the jury's verdict, which awarded Hawkins $1,000,000.00 and Harris and Harris S.A. $1,151,000.00, Harris filed a motion for judgment in accordance with its motion for a directed verdict and sought to have the claims of Hawkins dismissed as a matter of law. AGC filed a motion for a directed verdict in respect to the claims of both Harris and Harris S.A. and also motions for a new trial, for remittitur, and a motion for additur

1. Arcata Graphics Company is a Delaware corporation which owns a number of subsidiaries engaged throughout the United States in the printing business. Arcata Graphics Kingsport, Inc. is a subsidiary of Arcata Graphics Company and has a division in Hawkins County, Tennessee, Arcata Graphic/Hawkins.

Both Harris and Harris S.A. are Delaware corporations. Harris has headquarters in Dover, New Hampshire, and Harris S.A., while owned by the same parent company as Harris, is a French company. Both companies are engaged in the manufacture and sale of printing presses.

with respect to the judgment entered in its favor.

On 24 August 1992, the trial court denied all post-trial motions.

### THE FACTS

Hawkins determined in 1986 that it wanted to purchase a press to print ten-inch books. AGC representatives considered a number of different kinds of presses and toured numerous printing operations, including a trip arranged by Harris to a number of printers in Europe. After considering the various types and sizes of presses available, AGC decided it would buy a large press from Harris, the N–9000. The parties entered into a Sale and Purchase Agreement with respect to the N–9000 press.

In the fall of 1986, subsequent to the execution of the Sale and Purchase Agreement, James Carpenter was employed as head of Hawkins. Mr. Carpenter was concerned that AGC had contracted to buy the wrong size press and that AGC's prospective customers would prefer smaller presses with a 21–inch cutoff.[2] AGC then cancelled the contract for purchase of the N–9000 and began discussions with Harris and other press manufacturers regarding a press with a 21–inch cutoff. Harris then offered its M–1000. Harris had never made an M–1000 in a 21–inch cutoff, but was willing to do so. James Carpenter was of the opinion the M–1000 was a good choice, but the date by which Harris could deliver an M–1000 was not acceptable. AGC continued to look at other presses.

AGC's next choice was a press manufactured by Hantscho. This press was perceived to be the mainstay of the ten-inch book market Hawkins was attempting to enter. Hawkins also discussed with Harris the possible purchase of two M–300M's, another press not yet built in a 21–inch cutoff, but which Harris was willing to modify to meet AGC's specifications. When Harris reduced its price and promised an earlier delivery date, AGC decided to purchase two M–300M's from Harris.

Harris had begun marketing the M–300 press in 1982. It was initially manufactured in the United States and was primarily sold in the U.S. market. In 1986, however, Harris decided to shift the manufacture of the press to its French facility as part of a plan to market the press worldwide. As a part of this transfer of operations, design changes were made in the M–300, in part to reduce the cost of manufacturing and in part to improve the press. The French manufactured press was called the M–300M.

Jim Carpenter, division head of Hawkins, and Frank Beacham, corporate vice president of engineering for AGC, were the individuals most responsible for negotiating on behalf of AGC with Harris concerning the M–300M. While they were no longer employed by Arcata/Hawkins at the time of this litigation, their depositions were taken and introduced as evidence. Neither Mr. Carpenter nor Mr. Beacham believe that Harris misrepresented to Arcata/Hawkins the capabilities of the M–300M. Mr. Carpenter testified that Harris openly acknowledged to him that Harris was having technical problems with the new M–300M, but assured him that those problems would be worked out by the time AGC's presses were delivered, and that if problems arose, Harris would fix them.

Two Arcata/Hawkins employees testified concerning the "fraudulent misrepresentation" charge, both of whom were, in relation to Mr. Carpenter, on the fringes of negotiations with Harris. They were John Branam, Hawkins' marketing services director, who testified that he attended two meetings with Harris employees and that Harris, concerning the M–300M, stated they were state-of-the-art technology, would print at 1200 feet per minute, were capable of quick makeready work, were waste efficient, and would produce high quality, four-color work. Mr. Branam also testified that he read and relied upon similar statements in the M–300M sales brochure furnished by Harris.

Mr. Branam did not participate in the negotiations with Harris regarding the N–9000.

---

**2.** The "cutoff" size of a press refers to the circumference of the cylinder on which the plates containing impressions to be printed are attached. The N–9000 press originally ordered by Arcata had a 42–inch cutoff.

Neither did he recall seeing any literature concerning the N–9000. He was also unaware that Hawkins had seriously considered purchasing an M–1000 before deciding on the M–300M. He did not speak to any representative of Hantscho about the Hantscho press which Hawkins came close to purchasing.

The second employee, Mr. Junior Marshall, pressroom supervisor at Hawkins, also testified that he had conversations with Harris employees concerning the M–300M. He testified that Harris represented that the M–300Ms were state-of-the-art, fast, make-ready presses that were as good or better than the Dahlgren, a competitor of Harris'. He had also read the sales brochures on the M–300M. Mr. Marshall also did not recall that Hawkins had considered an M–1000 prior to considering the M–300M. He did not recall having any conversations with Hantscho, nor recall if he reviewed any Hantscho sales brochures.

The original contract for the purchase of the M–300M presses by Hawkins was signed by Hawkins on 18 February 1987 and by Harris on 9 April 1987. The Purchase Agreement provided that Harris' liability did not include loss of anticipated profits or special, incidental or consequential damages.

3. The 21 December 1988 letter agreement is as follows:

December 21, 1988
Mr. Frank W. Beacham
Vice President, Printing Technologies
Arcata Graphics Company
201 North Charles Street
Baltimore, Maryland 21201
We are pleased that Arcata has agreed to the proposed settlement offer made by us November 30th. We wish, however, to provide clarification of certain details which you have included in your letter of December 8th:
1. Harris Graphics proposes that a check in the amount of $462,170 be issued to Arcata/Fairfield and that Arcata/Hawkins issue a check to Harris Graphics in the amount of $1,880,779 to clear our accounts and that these payments are due in December 1988.
2. Harris Graphics will continue to honor the warranties of the presses and will continue to work on those problems enumerated in # 1 of your letter with special emphasis on ink/water balance. If this problem is not resolved by 12/31/89, Arcata reserves the right to return the presses.
3. We propose to extend the warranty on the M–300M presses at Hawkins County through

The agreement also provided for a one year warranty period during which Harris agreed to repair or replace equipment not performing as warranted, or if unable to repair or replace, to refund Hawkins' purchase price. The Agreement also provided that, except as provided in the Agreement, there were no other warranties and that the remedies set forth in the Agreement were the "sole and exclusive remedies."

Harris acknowledged at trial that the problems experienced by Hawkins with the M–300Ms in the months following their installation in 1988 were abnormal and unacceptable.

Harris worked throughout 1988 attempting to remedy the press problems. On 21 December 1988,[3] the parties entered into a letter agreement, which amounted to a modification agreement, and made a number of contractual concessions in exchange for what Harris contends was a full settlement of Hawkins' complaints and demands.

In its answer and counterclaim, Harris pled an accord and satisfaction which it contends arose out of the 21 December 1988 letter agreement.

12/31/89. During this extended warranty period, Arcata will receive parts and normal press services at no charge, and Harris Graphics will rectify any problem now existing or discovered during the extended period at no cost to Arcata.
4. The settlement agreement as described in this letter includes the issues raised at our meeting. There was no discussion of discounts on future Arcata orders. Our meeting, as you know, was intended to resolve your open issues and to reach a settlement of these issues. The agreed upon reduction of the amounts due to Harris Graphics by Arcata was intended to settle all the open demands by Arcata, including those enumerated in Mr. Swam's letter of September 23, 1988 to Mr. Kaplan.
If this is in keeping with your understanding of our agreement on the matter, please sign this letter in the space provided below and return a copy to me for my files.
Very truly yours,
/s/ John M. Hobby
John M. Hobby,
Vice President
Agreed:
ARCATA GRAPHICS COMPANY
By /s/ Robert Swam
12/22/88

■ When it is shown that the creditor accepted payment with the intent that it should operate as a satisfaction, an accord and satisfaction has been established. *Pinney v. Tarpley,* 686 S.W.2d 574 (Tenn.App. 1984).

Here, there is no question that Hawkins accepted payment with the intention that it should operate as a satisfaction except to those items which were specifically reserved. A counter or additional claim "does not render the principal obligation unliquidated where such principal obligation is itself not in dispute." *B. Mifflin Hood Co. v. Lichter,* 106 F.Supp. 220 (E.D.Tenn.1950).

■ On 8 December 1988, AGC, by letter, accepted the settlement proposed by Harris. In the letter agreement of 21 December 1988, the parties agreed that they were settling and resolving all open issues and demands. At that time, Hawkins was fully aware of all existing and potential problems with the M–300Ms. Hawkins had complained of each of the problems of which it complained at trial. Hawkins had complained as early as September 1988 that the M–300Ms did not perform as Harris had represented. When Hawkins accepted the concessions offered by Harris, including the monetary concession, Hawkins released any claim it may have had that Harris misrepresented the M–300Ms during the negotiations leading to the sale. Hawkins accepted the benefits of the 21 December 1988 agreement.

Hawkins never sought to rescind the 21 December 1988 letter agreement, did not tender back to Harris the benefits Hawkins received pursuant to the letter agreement, and, to the contrary, asserted as a claim at trial that the December 1988 agreement was breached by Harris.

We begin by discussing the issues raised by the plaintiffs, the first of which is:

The Trial Court Erred in Denying Plaintiffs' Motion for Directed Verdict and to Dismiss the Claims of Harris, S.A.:

1. Because Harris, S.A. was not registered to do business in Tennessee, its claims should have been dismissed.

2. The Trial Court erred in allowing Harris, S.A. to assert its claims less than two weeks prior to trial.

3. The Trial Court erred in denying Plaintiffs' Motion for Directed Verdict with regard to Harris, S.A.'s claim for breach of contract because there was no evidence of any contract between Harris, S.A. and Plaintiffs.

4. The Trial Court erred in denying Plaintiffs' Motion for Directed Verdict with regard to Harris, S.A.'s counterclaim for fraud.

The appropriate standard by which to judge a motion for directed verdict in Tennessee is as follows:

[A] motion for a directed verdict requires the trial Judge and reviewing Court on appeal to look to all of the evidence, to take the strongest legitimate view of it in favor of the opponent of the motion, and to allow all reasonable inferences from it in his favor; to discard all countervailing evidence, and if then, there is any dispute as to any material determinative evidence, or any doubt as to the conclusions to be drawn from the whole evidence, the motion must be denied....

*Country Maid Dairy, Inc. v. Hunter,* 57 Tenn.App. 138, 149, 416 S.W.2d 367, 372 (1967).

Plaintiffs contend that there is "no evidence" to support Harris's counterclaim alleging fraud on the part of AGC.

■ However, Harris presented evidence to counter the directed verdict motion. Brick Rossie, who was a former press engineer at Hawkins, testified that he was the engineer at Hawkins with the principal responsibility for the M–300Ms. Part of his job was to review Hawkins' performance data to see if the M–300Ms were satisfying the "criteria for acceptance" set out in AGC's letter of 8 December 1988. Mr. Rossie testified that he would read the production data and conclude, at least on a preliminary basis, that the presses were, in fact, meeting the "criteria for acceptance." He reported his findings to Paul Hollinger, Division Manager of Hawkins, and Mark Hatfield, head engineer. He received a response that his con-

clusion was "not possible." He was not instructed to prepare a report or to examine his conclusions, nor was he asked to look at any further data. Harris was never advised of Mr. Rossie's findings and conclusions.

Clint Bolte, a printing industry consultant who was retained by Harris, reviewed the monthly production data for 1989 with respect to the M–300Ms. He concluded that the presses met the "criteria for acceptance" in 1989 both for the month of April and November. AGC never informed Harris that the criteria had been met, but, to the contrary, specifically complained to Harris throughout the fall of 1989 that the criteria had not been met. Mr. Bolte concluded that both presses met the "criteria for acceptance" for 1989.

The trial court properly denied plaintiffs' motion for a directed verdict and to dismiss the claims of Harris S.A.

Plaintiffs next argue that Harris S.A. was not registered to do business in Tennessee and its claims should have been dismissed.

Plaintiffs moved the trial court to dismiss Harris S.A.'s complaint because it had not obtained a certificate of authority to do business in Tennessee as required by Tennessee Code Annotated Section 48–25–101 *et seq.*, and that, therefore, pursuant to Tennessee Code Annotated Section 48–25–102(a), Harris S.A. is prohibited from maintaining suit in Tennessee.

Tennessee Code Annotated Section 48–25–102(a) provides: "A foreign corporation transacting business in this state without a certificate of authority may not maintain a proceeding in any court in this state until it obtains a certificate of authority." That Harris S.A. did not have a certificate of authority at the time it filed its answer and counterclaim against AGC and Kingsport is uncontradicted.

Plaintiffs did not assert as a defense Harris S.A.'s lack of certificate of authority until the trial was well underway.

■ Harris S.A. is a French company with offices only in France and Great Britain. Harris S.A. did not have at the time of trial, or at any other time, any office or other facility in Tennessee. We think the record is void of any proof that Harris S.A. transacted business in Tennessee which would require a certificate of authority.

However, even if the evidence was clear that Harris S.A. had transacted business in Tennessee, plaintiffs' contention in this instance is without merit. Harris S.A. had been sued in Tennessee courts and was merely asserting as a defense a counterclaim, which arose out of the same transaction.

Tennessee Code Annotated Section 48–25–102(f) provides: "Notwithstanding subsections (a) and (b), the failure of a foreign corporation to obtain a certificate of authority does not impair the validity of its corporate acts or prevent it from defending any proceeding in this state."

This contention of plaintiffs is without merit.

Plaintiffs next contend that it was reversible error to allow the addition of Harris S.A. as a counterclaim party less than two weeks prior to the beginning of trial.

■ When the trial court grants a motion to amend, the opposing party must request a continuance if it believes it has been prejudiced. *Allstate Ins. Co. v. Fox,* 1990 WL 8058 at *12 (Tenn.App. 6 Feb. 1990). If a continuance is not requested, the party against whom the amendment was granted may not complain on appeal. *Id.*

■ In this instance, plaintiffs at no time requested a continuance to enable them to make additional preparations as a result of the trial court allowing the addition of Harris S.A. as a counter-plaintiff. AGC failed to request a continuance and has now waived its right to complain that the motion to amend was granted.

Trial courts have great discretion in granting or denying amendments. *Merriman v. Smith,* 599 S.W.2d 548 (Tenn.App.1979). Tennessee Rule of Civil Procedure 15.01 provides that amendments to pleadings are to be liberally granted. Amendments may be granted even after trial. Tenn.R.Civ.P. 15.-02.

■ In this case, the counterclaims of both Harris and Harris S.A. were almost identical.

While the amendment adding Harris S.A. was granted shortly before trial, plaintiffs were well aware for a substantial length of time prior to the granting of the motion to amend that the counterclaim expenses and damages had been sustained by Harris S.A. During the taking of the deposition of Robert M. Cabral two months before trial, Arcata was put on notice that many of the expenses asserted in the counterclaim were sustained by Harris S.A. Plaintiffs were also allowed to depose two of the French officers of Harris S.A. prior to trial.

Plaintiffs have failed to show how they were deprived of making a defense to the suit because of the addition of Harris S.A. as a counter-plaintiff to the suit. This record shows no prejudice caused by the addition of Harris S.A. as a counter-plaintiff. This issue is without merit.

■ Plaintiffs also attack the counterclaim of Harris S.A. on the ground that any misrepresentation by plaintiffs was not made directly to Harris S.A., which is not a party to the agreement.

The "right to recover for fraud or deceit is not restricted to the parties to a transaction, but extends to third persons injured thereby, at least where such third persons are intended to rely and act upon false representations and they do so rely and act thereon, to their damage." 37 Am.Jur.2d *Fraud and Deceit* § 298 (1968).

Plaintiffs also argue that "[t]he Trial Court Erred in Denying Plaintiffs' Motion for a Directed Verdict with Regard to Harris, S.A.'s claim for breach of contract because there was no evidence of any contract between Harris, S.A. and Plaintiffs."

■ The verdict returned by the jury was a general verdict in favor of Harris S.A. on its counterclaim and the jury was not asked to distinguish between Harris' fraud claim and its contract claim. There is material evidence to support the fraud claim. It is, therefore, irrelevant whether the contract claim was also good. The failure to direct a verdict on one count is not grounds for reversal of a jury's general verdict when other counts are supported by material evidence. *Central Truckaway System v. Waltner*, 36 Tenn.App. .202, 253 S.W.2d 985 (1952). *See also, Taylor v. Cobble*, 28 Tenn.App. 167, 187 S.W.2d 648 (1945).

■ Harris contends, and we agree, that AGC had an implied contractual duty to act in good faith and advise Harris if and when the "criteria for acceptance" were met. A duty in good faith and fair dealing is implied under Tennessee law in the performance of every contract. *TSC Industries, Inc. v. Tomlin*, 743 S.W.2d 169, 173 (Tenn. App.1987). In this case, the "criteria for acceptance" were the standards proposed by AGC itself for determining when the ink-water balance problem was satisfactorily resolved. While the 21 December 1988 letter agreement did not specifically adopt the "criteria for acceptance," it does state that Harris would give special emphasis to the ink-water balance problem and that if this problem was not resolved by 31 December 1989, AGC could return the presses for a refund. AGC was in exclusive possession of the performance data necessary to determine whether the ink-water balance problem was resolved. AGC obviously had an implied duty to fairly and honestly inform Harris when the problem was resolved. AGC had proposed the "criteria for acceptance" as the quantitative standard for making the determination and therefore had a duty to advise Harris if the standard was met.

■ Plaintiffs' next issue is: "After a juror on the first day of trial had stated to counsel for Defendant and Harris, S.A., 'Keep it up boys. You've got the edge,' the Trial Court erred in declining to interview that juror and in denying Plaintiffs' Motion for Mistrial."

■ This juror's comment does not amount to misconduct *per se*, nor does it establish that the juror had already made up his mind. Hawkins cites no authority whatsoever in support of the proposition that such a suggestive comment is grounds for a new trial. The law in this state is clear that evidence of a juror's subjective thought processes is not legally sufficient grounds for a new trial. *Caldararo v. Vanderbilt University*, 794 S.W.2d 738, 743–44 (Tenn.App.1990).

While the trial court refused AGC's request that the juror be individually interrogated, it did quite properly give an appropriate instruction to the jury later the same day. That instruction is as follows:

Ladies and gentlemen of the jury, let me renew the instructions that I have given you each time you've left the courthouse at noon and at night. Please do not discuss this case with anybody, not even among yourselves. I know as we stay together, and especially in these confined circumstances, there is more and more of a tendency for us to, as human beings, for us to talk, but we want every party involved in this litigation, at the end of it, to feel like they have played on a level, equal playing field, and a fair trial for everybody. And sometimes, even remarks that are casual which had no intended purpose whatsoever, sometimes remarks even that are made in jest, can be misinterpreted, so while we are away from the courthouse or around the courthouse, let's please try not to talk about the lawsuit, and to wait until all the evidence is in before your opinions are formed until you do your deliberations.

We are of the opinion that this instruction cured any problem that might have arisen.

The granting or denying of a motion for a mistrial is within the sound discretion of the trial court. *Frazier v. State,* 566 S.W.2d 545 (Tenn.Crim.App.1977).

There has been no showing that plaintiffs were prejudiced by this juror's statement or that the statement affected the verdict in any way. Even if there was error with respect to this individual juror's statement, it was harmless. Tenn.R.App.P. 36(b).

Plaintiffs next complain that "[t]he Trial Court erred in ruling that the 1988 Letter Agreement was not a settlement agreement, but was only a modification to the initial 1987 Purchase Agreement."

We think plaintiffs have mischaracterized the trial court's ruling. The trial court acknowledged that the December 1988 letter agreement contained several provisions, but simply held that the December 1988 agreement modified the original agreement and that both agreements must be consulted and considered in order to determine the rights and obligations of the parties.

The December 1988 letter agreement includes a settlement of all outstanding claims and demands. Contrary to plaintiffs' assertions, however, there is no rule of law prohibiting an agreement from being both a contractual modification and a settlement agreement. This issue is without merit.

Plaintiffs' next issue is that "[t]he Trial Court erred as a matter of law in excluding evidence at trial concerning the cost of replacing the non-performing Harris presses."

Plaintiffs argue that the court erred in excluding evidence of the costs plaintiffs would have had to incur to replace the two M–300M presses.

Paul Hollinger, head of Hawkins, gave his opinion at the trial as to why the replacement remedy was not satisfactory to plaintiffs. His testimony included the following statement: "And the fact is we knew we couldn't replace those presses without spending at least three million more than what Harris would have given back to us." If the trial court did err in excluding proof earlier, the evidence of replacement costs ultimately found its way into the record and any error that might have been made earlier was rendered harmless. Tenn.R.App.P. 36(b).

Plaintiffs' next issue is that "[t]he Trial Court erred in excluding evidence of the 1988 Settlement Agreement and Contract Amendment."

The trial court excluded evidence that the shipment of the presses was delayed and that Hawkins was given a payment credit of approximately $400,000.00 in compensation for the delay. This evidence was excluded in response to a motion *in limine* filed by Harris. Delay in shipment was not a part of plaintiffs' damage claims and, because of the substantial threat that this evidence would prejudice Harris, confuse the jury and needlessly complicate a complex lawsuit, the trial court acted well within its discretion in excluding the evidence. Questions regarding admissibility of evidence rest within the sound discretion of the trial court. The trial court's decision in admitting or excluding

evidence will be reversed only on a showing of an abuse of discretion. *Royal v. Days Inns of America, Inc.*, 708 S.W.2d 411, 414 (Tenn.App.1985). There has been no showing of an abuse of discretion in excluding this evidence.

■ Plaintiffs' next issue is that "[t]he Trial Court erred at trial by admitting, as substantive evidence, handwritten summaries made by Defendant's counsel of selected portions of witness testimony favorable to his client."

Both plaintiffs' counsel and counsel for Harris submitted "summaries of testimony" regarding some of the documents. Plaintiffs contend that their summaries, which the trial court used as a "fairness" precedent, related only to damages. In any event, the summaries prepared by Harris' counsel were accurate and not prejudicial. Plaintiffs have failed to show that if there was error, it was error that involved "a substantial right [which] more probably than not [affected] the judgment." The error, if any, was harmless. Tenn.R.App.P. 36(b).

Plaintiffs' next issue is that "[t]he Trial Court erred by allowing plaintiffs' corporate representatives and officers to be examined regarding matters not within their personal knowledge."

Plaintiffs argue inaccurately, we think after reviewing this record, that the trial court "required corporate representatives [of plaintiff] to testify and express opinions regarding matters about which they had no personal knowledge." The trial court here simply allowed Harris' counsel to ask plaintiffs' corporate representatives questions at trial concerning documents which were business records of plaintiffs. If plaintiffs' witnesses had no knowledge about a document or could not discuss it, they were free to so state. We find no error in this regard.

Plaintiffs' next issue is that "[t]he Trial Court erred in dismissing the claims of Arcata Graphics Company, despite the fact that it was the party which negotiated and entered into the 21 December 1988 and December 1989 letter agreements with defendants."

■ At trial, plaintiffs attempted to prove damages allegedly sustained by Hawkins. Plaintiffs' damage proof was exclusively limited to allegations regarding excess expenses and lost profits of Hawkins. There was no attempt to prove damages separately sustained by AGC, the parent company of Hawkins. Hawkins cites testimony for the proposition that AGC introduced proof that it was damaged. However, this testimony is general. It provides no quantification of any alleged damages sustained by AGC. This testimony clearly gave the jury no basis for making any separate award to AGC. We find no merit to this issue.

Plaintiffs' next issue is that "[t]he Trial Court erred in refusing to instruct the jury with regard to Plaintiffs' claim that Defendant had either waived, or was estopped from asserting, the remedy and damage limitations contained in the 1987 Purchase Agreement."

Hawkins' contention that the trial court erred in failing to submit its special jury instructions regarding waiver and estoppel is meritless. Theories which plaintiffs requested the trial court to charge were not supported by the evidence at trial. Hawkins' contention is that Harris waived the remedy and damage limitations contained in the original purchase agreement signed in 1987 when it entered into the 1988 and 1989 modifications to the contract, and that Harris should be estopped from complaining about Hawkins' fraud because it admitted that the presses experienced problems.

The record shows that Hawkins, not Harris, asked the court to decide as a matter of law whether the agreements of 1988 and 1989 constituted separate, stand-alone, agreements or amendments to the original 1987 purchase agreement. In response to Hawkins' request, the court ruled that the original 1987 contract and the two later modifications constituted "one contract, twice modified." Plaintiffs now contend the court should not have interpreted the contract as a matter of law and that the jury should have been permitted to determine whether or not the remedy and the damage limitations contained in the original contract were carried forward to the 1988 and 1989 agreements.

 Plaintiffs are not entitled to have it both ways. It would have been improper for the court to hold that the remedy and damage limitations contained in the original 1987 contract were carried forward to the 1988 and 1989 agreements and then permit the jury to find that the agreement extending those limitations, in fact, extinguished them.

 The contention that Harris waived the original contract limitations in connection with the 1988 and 1989 modifications is refuted by the fact that in June of 1990 plaintiffs requested Harris to agree that the contractual limitations on recovery of incidental and consequential damages be waived. This request establishes that plaintiffs knew the limitations had not previously been waived.

 However, in view of the fact that the jury did, in fact, award $1,000,000.00 to plaintiffs in incidental or consequential damages, it is clear that plaintiffs were not prejudiced at trial.

Plaintiffs' argument that Harris is estopped from maintaining its counterclaim for damages is also without merit, and the trial court properly refused Hawkins' proposed instruction. The evidence at trial established that, although the presses experienced numerous problems during start-up, Harris eventually corrected the problems, and there is evidence that Hawkins fraudulently concealed this fact from Harris.

We find no factual or legal basis for plaintiffs' argument that Harris is estopped from seeking compensation for damages resulting from Hawkins' intentional fraud.

Plaintiffs also argue that the trial court failed to instruct the jury that the contractual remedy and damage limitation did not apply to plaintiffs' claims for misrepresentation. The record reveals that the court's instructions adequately covered this issue and that the jury was not misled by the trial court's instructions.

 The trial court first instructed the jury regarding the substantive elements of the parties' respective claims and then proceeded to instruct concerning damages. The trial court first identified the damages that would be available for breach of contract warranty. As a part of this discussion of contract warranty damages, the court gave instructions relating to the contractual limitations. The court then separately instructed the jury as to the damages recoverable on the fraud claims. The trial court properly instructed the jury that if it found in favor of either plaintiffs or Harris on the fraud claim, "you must then award plaintiff damages, including actual damages, loss profits, and potentially punitive damages." In discussing potential fraud damages, the trial court did not discuss the contractual limitations.

Plaintiffs' counsel argued to the jury in closing that there were "two roads to justice in this case, one through contract and one through fraud." Counsel further argued that although the contract road was "a bumpy road," the fraud road is a "four-lane autobahn." He then argued to the jury that the bumps in the contract route did not apply to the fraud route. We are of the opinion there was no error and no confusion with respect to this point.

Plaintiffs' next issue is that "[t]he Trial Court erred by entering judgment on what were clearly inconsistent verdicts."

 Plaintiffs argue that there was confusion created by the answer to the question propounded by the jury during its deliberations. The jury asked about the total damages sought by Harris on its counterclaim. The jury was advised by the trial court that these damages could be found in the exhibits. Plaintiffs argue that this created confusion because the damage exhibits also included the $250,000.00 parts invoice as to which Harris had obtained directed verdicts against AGC.

We respectfully disagree that this would create confusion. The trial court had clearly advised the jury with respect to the $250,000.00 directed verdict and that this matter was not for the jury's consideration. We find no reason to infer that the jury did not understand and obey this instruction. The total damages sought by Harris and Harris S.A. exceeded the $1,151,000.00 awarded by the jury collectively in favor of these parties.

 We think it was appropriate for the trial court to divide the jury's collective

award between Harris and Harris S.A. The undisputed proof demonstrated that Harris S.A. sought damages of $512,000.00. The trial court, therefore, gave Harris S.A. judgment in this amount and awarded the balance of the jury's collective award to Harris, which had sought slightly more than the amount it was ultimately awarded. In construing a verdict, courts are to give effect to the intention of the jury. *Briscoe v. Allison,* 200 Tenn. 115, 290 S.W.2d 864, 868 (1956). *Briscoe* holds that "[i]f after an examination of the terms of the verdict the court is able to place a construction thereon that will uphold it, it is incumbent upon the court to do so." *Id.* Although a verdict may be defective in form, if it substantially defines an issue in such a way as to enable the court intelligently to pronounce a judgment thereon, it is sufficiently certain. *Tennessee Central Ry. v. Scarbrough,* 9 Tenn.App. 295, 299 (1928).

In the instant case, the jury's verdict was sufficiently certain to allow the court to intelligently pronounce judgment based on the undisputed evidence. We find no error.

We have considered each of the issues raised by plaintiffs and find them to be without merit.

We next discuss together the two issues presented by Harris. They are:

1. Is Heidelberg Harris, Inc. ("Harris") entitled to a directed verdict dismissing Arcata Graphics' monetary damage claims for alleged breach of contract/warranty in the sale of printing presses when the contract between the parties prohibits such a damage claim and also provides that Arcata's sole remedies were repair, replacement, or a refund of the purchase price?

2. Is Harris entitled to a directed verdict dismissing Arcata's misrepresentation claim when there was *no* evidence of fraud and when Arcata settled and released any such claim in a contractual modification executed by the parties *after* Arcata was aware of the facts underlying its alleged misrepresentation claim?

Harris moved the trial court during trial and in post-trial motions to dismiss Hawkins' claims as a matter of law. Harris argued that Hawkins contract and/or warranty claims were prohibited by provisions in the contract specifically excluding monetary damage claims and by the clause providing that Hawkins' sole remedy is to return the presses for a refund.

[A] motion for a directed verdict ... requires the trial Judge, and the appellate court on review to look to all the evidence, to take the strongest legitimate view of it in favor of the opponent of the motion, to allow all reasonable inferences from it in his favor to discard all countervailing evidence; and if then there is any dispute as to any material determinative evidence, or any doubt as to the conclusion to be drawn from the whole evidence, the motion must be denied.

*General Motors Corp. v. Dodson,* 47 Tenn. App. 438, 338 S.W.2d 655, 658 (1960) (quoting *Poole v. First National Bank of Smyrna,* 29 Tenn.App. 327, 196 S.W.2d 563, 567 (1946)).

There is a dispute here as to which state law is applicable to Hawkins' breach of contract and warranty claims. Harris contends that the claims are governed by the law of Connecticut, as required by the original security agreement. Hawkins argues that, despite the contractual choice of law, Tennessee law should be applied.

Generally, Tennessee honors the choice of law by contracting parties so long as the transaction bears a reasonable relation to the state whose law is chosen. Tenn.Code Ann. § 47–1–105. "In a multi-state transaction, the contracting parties' choice-of-law provision is valid absent contravention of public policy of the forum state or a showing that the selected forum does not bear a reasonable relationship to the transaction." *Carefree Vacations v. Brunner,* 615 F.Supp. 211 (W.D.Tenn.1985).

■■■■ When the instant contract was negotiated and executed, Harris had an office in Pawcatuck, Connecticut. Most of the correspondence and communications regarding the sale and purchase of the M–300Ms and other Harris presses considered by Hawkins took place between Hawkins and Harris' Connecticut office. We are of the opinion that the fact that Harris had a Connecticut office and that much of the negotiations regarding the

contract in this case involved Harris personnel in the Connecticut office provides a reasonable connection to support the parties' choice of Connecticut law as controlling with respect to the sale and purchase contract.

The trial court correctly held that the contract between the parties is embodied in 1) the original security agreement executed in 1987, 2) the 21 December 1988 letter agreement, and 3) the 19 December 1989 letter agreement.

The original security agreement states on its face that Hawkins "is expressly notified and hereby agrees, that Seller's liability hereunder shall not include loss of anticipated profits or special, incidental, or consequential damages." The agreement also provides that the remedies afforded Hawkins in the agreement, *i.e.*, repair, replacement or return for refund "shall be the sole and exclusive remedies."

We find nothing in the 21 December 1988 or the 19 December 1989 letter agreements which attempt to abrogate the contractual limitations contained in the original security agreement. Hawkins argued at trial that the December 1988 letter agreement was a separate contract which superseded and did away with the original security agreement. We find no merit to this argument. The 21 December 1988 letter agreement shows on its face that it is not a separate, complete and superseding contract and does not contain all the terms necessary to understand and interpret it. The 21 December 1988 agreement provides that Harris would extend and continue to honor the warranties on the presses, but it does not identify what warranties are to be extended and honored. Likewise, the 19 December 1989 letter agreement extends undefined warranties. To determine those warranties, resort must be had to the original security agreement. Without doing so, the two letter agreements are incomplete and meaningless. Neither of the letter agreements contain an integration clause or purport to supersede prior agreements. We think the record shows the parties intended the original contractual terms to continue in effect as modified by the letter agreements. The two letter agreements are clear that the parties continued to contemplate in both December of 1988 and 1989 that Hawkins' remedy, should the presses ultimately prove unacceptable, was to return them for a refund and not to sue for monetary damages.

A modification of a written contract incorporates the new provisions, which supplant the affected portions of the original agreement, and as many terms of the original contract as the parties have not abrogated by the modification.

Although the effect of the modification is the production of a new contract, it consists not only of the new terms agreed upon but of as many of the terms of the original contract as the parties have not abrogated by their modification agreement.

17 Am.Jur.2d *Contracts* § 529 (1991). The "modifying agreement should be construed in connection with the original contract in order to ascertain the entire intent of the parties." *Id.* *See also, Corbin on Contracts* § 1296. A new agreement discharges the original contract only to the extent of inconsistency between them.

Here, there is no evidence of any intent to abrogate the contractual limitations contained in the original security agreement. The clear evidence reflects Hawkins' understanding that the contractual limitations continued in effect after both the December 1988 and December 1989 letter agreement modifications. On 1 June 1990, Hawkins sent Harris a letter requesting a third contractual modification. In this proposed modification, Hawkins requested Harris to waive the contractual limitations in the original security agreement. Harris did not agree to the third modification.

The Uniform Commercial Code, which is codified in the Connecticut statutes at C.G.S.A. Section 42a-2-101 *et seq.*, and in Tennessee at T.C.A. Section 47-2-101 *et seq.*, permits the limitation on remedies agreed to by Harris and Hawkins.

(1) Subject to the provisions of subsections (2) and (3) of this section and of the preceding section on liquidation and limitation of damages:

(a) the agreement may provide for remedies in addition to or in substitution

for those provided in this chapter and may limit or alter the measure of damages recoverable under this chapter, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts; and

(b) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

Tenn.Code Ann. § 47–2–719(c). For Hawkins to be entitled to the remedy it seeks for breach of warranty or contract, Hawkins must show that it falls within the exception to the general rule that parties may limit contractual remedies. U.C.C. § 2–719(2) provides that "an exception arises when circumstances cause an exclusive or limited remedy to fail of its essential purpose." Tenn.Code Ann. § 47–2–719(2).

█ Here, Hawkins has argued a failure of essential purpose. However, we are of the opinion that this argument is without merit in view of the adequate remedy provided in the contract, and offered by Harris, which allowed Hawkins to receive at no cost the type of dampening system it desired or to return the presses and receive a refund of the purchase price. These are fair and adequate remedies and were never invoked by Hawkins. The contractual remedy did not fail as a matter of law. U.C.C. § 2–719, per comment 1, requires only a "minimum adequate remed[y]." Section 2–719(2) is concerned with the essential purpose of the remedy chosen by the parties, not with the essential purpose of the code or of contract law, or of justice and/or equity. 1 White and Summers, *Uniform Commercial Code* § 12–10 (3d ed. 1988). U.C.C. § 2–719(2) is concerned only with novel circumstances not contemplated by the parties and does not contemplate agreements arguably oppressive at their inception. *Id.*

In *Damin Aviation Corp. v. Sikorsky Aircraft,* 705 F.Supp. 170 (S.D.N.Y.1989), the lessee of a helicopter sought to recover commercial losses caused by the helicopter's crash. The contract of sale confined the lessee's remedy to repair or replacement of defective parts. Plaintiff argued that the repair or replacement remedy failed of its essential purpose and sought to recover consequential damages. Plaintiff's contention was rejected and the court granted the defendant's motion for summary judgment, reasoning that the purchaser was able to replace the helicopter with the payment from the seller's insurance and that the plaintiff accordingly was not deprived of a substantial benefit of its bargain. *See also, McKernan v. United Technologies Corp.,* 717 F.Supp. 60 (D.Conn.1989) (a case involving a breach of warranty claim from the sale of a helicopter where the court held that a material issue of fact existed as to whether a limited repair or replacement remedy had failed of its essential purpose). The court noted, in *McKernan,* that the critical difference between *McKernan* and *Damin* was that the purchaser in *McKernan* did not have the option to recover the purchase price. *Id.* at 68–69.

█ Under Tennessee law, the availability of a refund remedy will prevent a repair remedy from failing of its essential purpose. *Internat'l Talent Group v. Copyright Management,* 769 S.W.2d 217 (Tenn.App.1988). In *International Talent Group,* the contract provided the remedy of repair of the defective computer system or, if repairs were not possible, for damages limited to payments received by defendant. The court held that this backup remedy prevented the repair remedy from failing of its essential purpose. The remedy available to International Talent Group, which was less than a tenth of its actual damages, was less substantial than that available to Hawkins in the instant case. *Id.* at 218–19. *See also, Marr Enterprises v. Lewis Refrigeration Co.,* 556 F.2d 951 (9th Cir.1977); *Garden State Food Distributors v. Sperry Rand Corp.,* 512 F.Supp. 975 (D.N.J. 1981). *See also, J. McDonald and E. Coleman, Commercial and Consumer Warranties* (1988) (where it is suggested the failure of a repair or replacement remedy can be avoided if the buyer has the additional remedy of a refund of the purchase price) and Walker, *Law Product Warranty,* § 8.04(2)(d) (providing a backup remedy of a refund of the purchase price "assures that the buyer is given at least one remedy that cannot fail of its essential purpose").

We are of the opinion that a warranty providing for repair, replacement or refund provides a minimum adequate remedy that cannot fail of its essential purpose. Hawkins' contract and/or warranty claims for monetary damages are therefore dismissed.

For the reasons set forth, the judgment in favor of plaintiffs and against Harris is reversed and remanded to the trial court for a new trial in accordance with this opinion. The judgment of the trial court is affirmed in all other respects.

Costs on appeal are taxed to the plaintiffs.

SANDERS, P.J. (E.S.), and FRANKS, J., concur.