# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs December 8, 2011

## DONNELL T. PORTER v. PRESTIGE AUTO SALES, INC.

**Appeal from the Circuit Court for Davidson County**
**No. 10C4116     Hamilton V. Gayden, Jr., Judge**

---

**No. M2011-00452-COA-R3-CV - Filed July 30, 2012**

---

Buyer purchased used automobile and signed contract stating the vehicle was being sold "as is" and without any warranties. After the transaction was completed and Buyer complained to Seller that the power steering was not working properly, Seller agreed to credit Buyer's account with the cost of repairing the power steering. Buyer was unwilling or unable to pay for the repair out of his own pocket, and Seller ultimately repossessed the vehicle. Buyer sued Seller for breach of contract and trial court awarded Buyer damages. Seller appealed and we affirm the trial court's judgment. Seller modified the parties' original contract when it agreed to compensate Buyer for the cost of repairing the vehicle.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR. and ANDY D. BENNETT, JJ., joined.

Thomas J. Drake, Jr., Nashville, Tennessee, for the appellant, Prestige Auto Sales, Inc.

Donnell T. Porter, Nashville, Tennessee, Pro Se.

**MEMORANDUM OPINION**[1]

**I. BACKGROUND**

Plaintiff Donnell T. Porter purchased a used automobile from Prestige Auto Sales, Inc. ("PAS") on July 24, 2010. Mr. Porter gave PAS $1,600 cash as a down payment and agreed to make periodic payments of $250 until the balance of $4,532.49 was satisfied. Mr. Porter signed a preprinted form titled "Bill of Sale; Sale Contract; Security Agreement and Disclosure Statement" (the "Contract") that included the following statement towards the bottom of the form in capital letters:

> THIS SALE IS MADE BY THE SELLER SUBJECT TO THE FOLLOWING CONDITIONS: (1) THERE IS NO IMPLIED WARRANTY OF MERCHANTABILITY, NO IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE (2) THE ABOVE DESCRIBED VEHICLE IS PURCHASED AFTER INSPECTION BY THE BUYER AT THE TIME OF SALE AND IS ACCEPTED "AS IS" WITH ALL FAULTS THAT MAY EXIST: THERE ARE NOT STATEMENTS, REPRESENTATIONS, GUARANTIES OR WARRANTIES, EXPRESS OR IMPLIED, MADE BY SELLER UNLESS HEREIN SET OUT. THE BUYER SHALL BEAR ALL EXPENSE OF REPAIRING OR CORRECTING ANY DEFECTS THAT MAY EXIST AT THE TIME OF SALE OR MAY OCCUR THEREAFTER IN SAID VEHICLE. THE SELLER DOES NOT ASSUME OR AUTHORIZE ANY OTHER PERSON(S) OR CORPORATION TO ASSUME SAID EXPENSE ON ITS BEHALR [sic].

Mr. Porter also signed a document titled "Buyers Guide" that included a statement that the dealer assumed no responsibility for any repairs.

Mr. Porter testified that he test drove the automobile before purchasing it and that while he was driving the vehicle it became overheated and the water hose broke. Mr. Porter testified he informed Rafik Shaltzi, the owner/operator of PAS, that the water hose broke, and Mr. Shaltzi instructed Mr. Porter to get a replacement hose. Mr. Shaltzi told Mr. Porter

---

[1]Tenn. R. Ct. App. 10 states:

This Court, with the concurrence of all judges participating in the case, may affirm, reverse or modify the actions of the trial court by memorandum opinion when a formal opinion would have no precedential value. When a case is decided by memorandum opinion it shall be designated "MEMORANDUM OPINION," shall not be published, and shall not be cited or relied on for any reason in any unrelated case.

that he would replace the water hose on the vehicle and would let him know when it was fixed. Mr. Shaltzi then telephoned Mr. Porter that evening to let him know the car was ready if Mr. Porter was still interested in purchasing it.

Mr. Porter testified that before he signed any papers he had a lengthy conversation with Mr. Shaltzi about the reliability of the vehicle, and Mr. Porter explained his need for a reliable car to get him back and forth to work. Mr. Porter testified Mr. Shaltzi promised him the vehicle would pass the auto emissions inspection requirement to enable Mr. Porter to have it registered, and that if Mr. Porter experienced any problems with the automobile Mr. Shaltzi would either have it fixed or would trade it in for another vehicle of equal value.

Mr. Porter testified that after three days the vehicle's power steering stopped working properly. He brought the vehicle back to PAS, and after confirming that the power steering was not functioning properly, Mr. Shaltzi instructed Mr. Porter to take the vehicle to A & H Auto Repair ("A & H") to be fixed. After inspecting the vehicle, the mechanic at A & H informed Mr. Porter that the rack and pinion on both sides were out, so it would do no good to fix the power steering without also repairing (or replacing) the rack and pinion mechanisms. Mr. Porter testified he telephoned Mr. Shaltzi to let him know the problem, and Mr. Shaltzi told him to go ahead and have A & H repair the car. A & H told Mr. Porter that it would not repair the car on behalf of PAS, however, because PAS did not have a history of paying its bills.

Mr. Porter telephoned PAS after the mechanic at A & H refused to repair the vehicle to ask Mr. Shaltzi what he was supposed to do next. Mr. Porter testified:

> I asked him I said what am I supposed to do, the car supposed, the car is guaranteed to pass Marta and I can't even drive it through Marta, and I told him I am just going to bring you the car back thinking that well he was going to trade off still try to do business with him, and when I told him I was going to bring it back, he . . . said you ain't bringing nothing back, and I said yes I am going to bring the car back. And he, by the time I got it back over there he had locked the facility down where I could not get the car in. So, I took the car back to my house because I could not drive it.

Mr. Porter testified further that after this incident he telephoned PAS again, and Mr. Shaltzi instructed him to have the vehicle towed to another auto shop and he would reimburse Mr. Porter for the charge. Mr. Porter explained to Mr. Shaltzi that he did not have the money to have the vehicle towed and fixed and instead asked Mr. Shaltzi to come retrieve the car. A few weeks later PAS repossessed the vehicle by sending a tow truck to Mr. Porter's residence and taking the vehicle away.

Mr. Porter filed a Civil Warrant in General Sessions on August 9, 2010, seeking to recover the $1,600 he paid towards the purchase of the vehicle. The General Sessions judge awarded Mr. Porter $1,000, and PAS appealed the judgment to the Circuit Court. PAS filed a Counterclaim in which it sought to recover $1,532.49 as compensation for the expense of towing the vehicle back to its place of business, repairing the vehicle, and cleaning it up.

Following the close of evidence, the trial court ruled in favor of Mr. Porter. The court stated the following in open court:

> Based on the proof, the credibility of the witnesses, reading section 47-2-316, exclusion or modification of warranties, the court believes that there was parol evidence surrounding the written contract, that there was an agreement to fix the car if it wasn't in good shape and the contract was breached by the defendant and therefore the Court grants judgment to the plaintiff in the amount of $1,600.00 and dismisses the counter-suit filed by the defendant, plus court costs.

The court issued a written order shortly thereafter stating:

> Based on the testimony of the witnesses, statements of the parties and counsel, the Court rules in favor of Donnell Porter in the amount of $1600.00 plus court costs. The Court further rules that the counter claim of Prestige Auto Sales is dismissed.

PAS appealed the trial court's judgment to this Court.

## II. ISSUES ON APPEAL

On appeal, PAS contends the trial court erred in the following ways: (1) by accepting Mr. Porter's unsworn opening statement as sworn testimony and granting him a money judgment without sworn proof or testimony supporting the judgment; (2) by finding a parol evidence exception to the written contract; and (3) by dismissing PAS's counterclaim when there was sufficient evidence to support the claim.

## III. ANALYSIS

The standard of review appellate courts use to review bench trial judgments is well-settled:

> With regard to a trial court's findings of fact, we will review the record de

-4-

novo and will presume that the findings of fact are correct "unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). We will also give great weight to a trial court's factual findings that rest on determinations of credibility. *In re Estate of Walton*, 950 S.W.2d 956, 959 (Tenn.1997); *B & G Constr., Inc. v. Polk*, 37 S.W.3d 462, 465 (Tenn. Ct. App. 2000). If, however, the trial court has not made a specific finding of fact on a particular matter, we will review the record to determine where the preponderance of the evidence lies without employing a presumption of correctness. *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997).

*C-Wood Lumber Co. v. Wayne Cnty. Bank*, 233 S.W.3d 263, 271 (Tenn. Ct. App. 2007).

Although the trial court did not draft a formal "Findings of Fact," the judgment it issued orally following the trial indicates the court found (a) there was parol evidence surrounding the written contract and (b) PAS agreed to fix the vehicle if it was not in good shape. Based on these findings of fact, the trial court reached the legal conclusion that PAS breached the parties' contract and that Mr. Porter was entitled to damages, which included the return of his money.

### A.  PAS Has Failed to Prove the Trial Court Erred in Relying on Mr. Porter's Testimony.

PAS first argues the trial court erred in treating Mr. Porter's opening statement as testimony because Mr. Porter was not sworn in prior to making his statement. Mr. Porter represented himself at trial, and the transcript shows that the court began the trial by inviting Mr. Porter to make an opening statement and tell the court what he thought he needed to prove. Mr. Porter responded by providing the court with the details of his case and explaining why he thought he was entitled to a return of his money as damages. Following Mr. Porter's recitation of the facts as he viewed them, the court stated:

> Okay, I will treat that as testimony as well as Opening Statement, however Mr. Drake, if you will make your opening statement I [will] have him come up here and you can cross examine.

We find PAS's argument unpersuasive for two different reasons. The purpose of Tenn. R. Evid. 603[2] is that the court determine the witness understands the necessity of

---

[2]Rule 603 of the Tennessee Rules of Evidence provides:

(continued...)

telling the truth while testifying. *State v. Griffis*, 964 S.W.2d 577, 592 (Tenn. Crim. App. 1997); *State v. Kendricks*, 947 S.W.2d 875, 881 (Tenn. Crim. App. 1996). Most of our cases dealing with Rule 603 involve child witnesses and the courts' determination that the child understand the difference between truth and story-telling. That is not the case here. PAS does not suggest Mr. Porter did not know the difference between telling the truth and telling a story.

Following PAS's attorney's opening statement, the court directed Mr. Porter to take the stand to allow PAS's attorney to conduct a cross examination. The court swore Mr. Porter in at this time, prior to his being cross examined by PAS's attorney. During his cross examination Mr. Porter revisited every issue he addressed in his opening statement. There was no inconsistency between Mr. Porter's testimony on cross examination and the statements he made in his opening statement.

Additionally, PAS's attorney objected to Mr. Porter's opening statement to the extent it included hearsay statements, but he did not object to the court's failure to swear Mr. Porter in after the court stated its intention to treat Mr. Porter's opening statement as testimony. Tennessee Rule of Appellate Procedure 36(a) provides in part that: "Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Since PAS failed to object in a timely manner to the court's decision to treat Mr. Porter's opening statement as his direct testimony, PAS has waived this issue. *See State v. Vizcaino-Ramos*, 2011 WL 3330294, at \*3 (Tenn. Crim. App. Aug. 3, 2011) (defense counsel waived Rule 603 objection when it failed to object to child's testimony at trial).

We find no error in the trial court's treatment of Mr. Porter.

**B. The Trial Court Correctly Ruled that PAS Breached the Contract.**

PAS argues that the parties' contract is clear and unambiguous on its face and that the trial court erroneously relied on the parties' parol evidence to vary the express terms of the Contract. Title 47 of the Tennessee Code Annotated addresses Commercial Instruments and Transactions. Chapter 2 addresses sales. Section 47-2-316, upon which the trial court relied, is titled "Exclusion or modification of warranties," and states in pertinent part:

---

[2](...continued)
Before testifying, every witness shall be required to declare that the witness will testify truthfully by oath or affirmation, administered in a form calculated to awaken the witness's conscience and impress the witness's mind with the duty to do so.

(1) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this chapter on parol or extrinsic evidence (§ 47-2-202) negation or limitation is inoperative to the extent that such construction is unreasonable.

Section 47-2-202 is titled "Final written expression – Parol or extrinsic evidence" and provides that terms of a written agreement may be explained or supplemented:

> (a) By course of performance, course of dealing or usage of trade pursuant to § 47-1-303; and
>
> (b) By evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

Section 47-1-303 defines "course of performance" and "course of dealing":

> (a) A "course of performance" is a sequence of conduct between the parties to a particular transaction that exists if:
>
> (1) The agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and
>
> (2) The other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection.
>
> (b) A "course of dealing" is a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

The Comments to Official Text explain that the phrase "course of dealing" is restricted to the conduct between the parties prior to the agreement, and "course of performance" includes the parties' conduct after or under the agreement. The Comments clarify that "'[c]ourse of dealing' may enter the agreement either by explicit provisions of the agreement or by tacit recognition."

The evidence introduced at trial showed that despite the Contract's language

purporting to exclude all warranties, PAS's conduct, both before and after the contract was signed, was otherwise. Mr. Porter testified that before he agreed to buy the automobile Mr. Shaltzi promised him the vehicle would pass the emissions test and that if Mr. Porter experienced problems with the automobile Mr. Shaltzi would either fix the problem(s) or trade it in for another vehicle of equal value. Then, after the agreement was signed and Mr. Porter made a down payment of $1,600, Mr. Shaltzi again agreed to have the vehicle repaired or to reimburse Mr. Porter for the cost of repair once the power steering went out. Mr. Shaltzi corroborated Mr. Porter's testimony to this effect:

> Q: Mr. Porter testified about water hoses and different things being wrong, what if anything did you do to fix the car, or what if anything was wrong with the car?
>
> A: Well he called me two weeks later after the deal and said that the power steering went out. I said bring it in maybe it needs some fluid. Went outside and the power the steering was not turning and go ahead and take it in and pay for it and I will credit your account, but he did not want to pay for it, he would not pay any, he did not want to come out of pocket, he spent all his money already. I said I don't mind paying for it, I will credit your account, bring me the receipt. He never would pay for it. He kept on driving the car with the bad power steering pump for another eight or nine days and as you know if you drive the car with a bad power steering pump your rack and pinion will go out. . . .

Based on both Mr. Porter's testimony and Mr. Shaltzi's testimony, we conclude the evidence preponderates in favor of the trial court's finding that PAS agreed to fix the automobile Mr. Porter purchased if it did not run properly. Mr. Shaltzi had not agreed to have the power steering fixed after the contract was signed. By offering to reimburse Mr. Porter or give him credit towards his remaining debt if Mr. Porter would pay for the repair out of his own pocket, PAS modified the Contract and negated the "no warranty" provisions of the Contract.

As the Tennessee Court of Appeals explained in *Arcata Graphics Co. v. Heidelberg Harris, Inc.,* 874 S.W.2d 15 (Tenn. Ct. App. 1993),

> A modification of a written contract incorporates the new provisions, which supplant the affected portions of the original agreement, and as many terms of the original contract as the parties have not abrogated by the modification.
>
> Although the effect of the modification is the production of a

new contract, it consists not only of the new terms agreed upon but of as many of the terms of the original contract as the parties have not abrogated by their modification agreement.

17 Am. Jur. 2d Contracts § 529 (1991). The "modifying agreement should be construed in connection with the original contract in order to ascertain the entire intent of the parties." *Id. See also, Corbin on Contracts* § 1296. A new agreement discharges the original contract only to the extent of inconsistency between them.

*Arcata Graphics*, 874 S.W.2d at 28; *see Hannahan v. Hannahan*, 247 S.W.3d 625, 627-28 (Tenn. Ct. App. 2007) (written contract may be modified by a subsequent contract that is express, written, oral, or implied); *Galbreath v. Harris*, 811 S.W.2d 88, 91 (Tenn. Ct. App. 1990) ("After a written contract is made, it may be modified by the express words of the parties in writing, as well as by parol.") (citing *Co–Operative Stores Co. v. United States Fidelity & Guaranty Co.*, 195 S.W. 177, 180 (1917)).

We affirm the trial court's judgment that PAS breached the parties' Contract as modified and that Mr. Porter is entitled to recover the $1,600 he paid for the automobile at issue. *See Wood v. Metropolitan Nashville & Davidson County Government*, 196 S.W.3d 152, 160 n.6 (Tenn. Ct. App. 2005) (Court of Appeals may affirm judgment on different grounds than those relied on by trial court when trial court reached correct result).

### C. The Trial Court Did Not Err in Dismissing PAS's Counterclaim.

The final argument PAS makes on appeal is that the trial court erred in dismissing its counterclaim for damages. In light of our holding that PAS breached the Contract by failing to repair the automobile's power steering problems, PAS is not entitled to recover on its counterclaim; we therefore affirm the trial court's dismissal of the same.

### IV. CONCLUSION

For the reasons stated above, we affirm the trial court's judgment. Costs of this appeal are assessed against the appellant, Prestige Auto Sales, Inc., for which execution shall issue if necessary.

_____
PATRICIA J. COTTRELL, JUDGE